**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| Zane Seipler, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.    08 c 50257 |
| ) | |
| Captain Anton Cundiff, et al., ) | Judge Kapala |
| ) | Magistrate Judge Mahoney |
| Defendants. ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTIONS  TO COMPEL AND FOR SANCTIONS**

Defendants Sheriff Keith Nygren, Captain Anton Cundiff, Lieutenant John Miller, Lieutenant William Lutz, Sergeant James Popovits, EEO Kathleen Seith, McHenry County Sheriff's Office, and the County of McHenry [hereinafter referred to collectively as "Defendants"], by their attorneys James G. Sotos and Elizabeth K. Barton of James G. Sotos & Associates, Ltd., respond to *Plaintiff's Motion to Compel Additional Time to Depose the Defendant Officers and Other Relief* ("Pl.'s Motion to Compel") (Dkt. No. 166) and *Plaintiff's Motion for Sanctions* ("Pl.'s Motion for Sanctions") (Dkt. No. 168) as follows:

**INTRODUCTION**

Plaintiff's Motion to Compel seeks (1) leave to file an amended Complaint; (2) two hours to re-depose Defendants Nygren, Miller, and Lutz, and one hour to depose Defendants Cundiff and Seith, and non-party Jeremy Bruketta; and (3) a stay of discovery pending the completion of an internal review.  (Dkt. No. 166.)  Plaintiff's Motion for Sanctions seeks (1) attorneys fees and costs related to Defendants' alleged failure to comply with discovery; and (2) a Rule to Show Cause concerning the release of Deputy Milliman's deposition transcript.  (Dkt. 168.)

Defendants have fully complied with Plaintiff's discovery requests. Indeed, Plaintiff has not even attempted to identify any discovery request that was not fully satisfied. As a result, Plaintiff is not entitled to re-depose any Defendants or witnesses whose depositions have been completed. Further, the pending internal review is unrelated to Plaintiff's claims, does not warrant an eighth extension of discovery, and is just the latest in an unending pattern of fabrications that Plaintiff routinely advance on the eve of every discovery close in order to needlessly extend this already protracted litigation. Finally, any release of Milliman's transcript to the media was neither a violation of the protective order nor was it attributable to Defendants. As a result, and because Plaintiff's Motion for Sanctions is the second time he has filed a frivolous sanctions request, the Court should sanction Plaintiff in order to put a stop, once and for all, to Plaintiff's unprofessional and unethical litigation tactics.

## ARGUMENT

**I.  DEFENDANTS HAVE FULLY COMPLIED WITH ALL OF PLAINTIFF'S DISCOVERY REQUESTS.**

Plaintiff boldly, and falsely, claims that Defendants "withheld" over 5,000 "new" tickets,[1] which were recently disclosed, and variously describes the alleged withholding as knowingly "faulty", a "scheme", and a "sham." (Pl.'s Motion to Compel, ¶6; Pl.'s Motion for Sanctions, ¶3 .) Notwithstanding this vitriol, Plaintiff does not even attempt to identify any discovery request that was not fully complied with. As demonstrated below, Defendants fully complied with all of Plaintiff's discovery requests, and his inflammatory rhetoric to the contrary is nothing more than bombastic hyperbole.

---

[1] Plaintiff also refers to 5,000 "arrests," but this is an incorrect statement. (*See* Pl.'s Motion for Sanctions, ¶ 3.) As described below, the spreadsheet produced to Plaintiff in January 2011 contains citations, warnings, and stop cards issued to drivers in 2007 and 2008.

In June 2009, Plaintiff served a request for production, which requested "all documents, records, statistics, compiled data and/or other documentation relating to *racial profiling statistics* for traffic stops and/or arrests and/or Terry stops engaged in by employees of the McHenry County Sheriff's Department." (*See* Defendants' Response to Plaintiff's Request, No. 15, attached hereto as "Exhibit A.") In response to this request, Defendants timely produced, in August 2009, the spreadsheet it had supplied to the Illinois Department of Transportation ("IDOT"), which included all of the citations the McHenry County Sheriff's Office ("MCSO") had generated that included racial profiling data. For over a year and a half, Plaintiff did not write or utter a word about this spreadsheet, nor did he ever suggest there was any deficiency in Defendants' production. Instead, Plaintiff first raised the issue in open court on November 15, 2010, at which time he made inflammatory and false comments about Defendants having provided false information which he relied upon in conducting his analysis, which is precisely the same argument he presents now.

As Defendants demonstrated in responding to Plaintiff's motion to extend discovery on December 14, 2010, Plaintiff's accusations were plainly false, and his cavalier regurgitation of them again after their falsity has been demonstrated is appalling. At her deposition on December 6, 2010, Jan Weech, the supervisor of the MCSO records division explained that the records division maintains a database that contains every citation issued by MCSO deputies. (*See* Transcript of Weech's Deposition, attached hereto as "Exhibit B," pp. 45-47.) To comply with Illinois racial profiling laws, MCSO is required to submit a record of citations issued by deputies to the IDOT. (*Id.*, p. 14.) Accordingly, in response to Plaintiff's request for "racial profiling statistics," Defendants properly provided Plaintiff the very same spreadsheets MCSO submitted to IDOT from 2004-2008.

3

At her deposition, Weech further testified that IDOT does not require MCSO to submit a record of citations where the racial profiling data is not completed. (*Id.*, pp. 14-19, 37-38.) As a result, the MCSO spreadsheet provided to both IDOT and Plaintiff did not contain records of those citations, warnings, and stop cards where racial profiling information had not been completed. Weech further explained there are a variety of reasons why racial profiling information need not be filled out on the back of a ticket, for instance, in cases where it is not an officer-initiated stop, such as a traffic accident. (*Id.*, pp. 16-17.)

At Weech's deposition, which Plaintiff chose to take in December 2010, Plaintiff for the first time made an informal verbal request for a spreadsheet that reflected every citation issued in 2004-2008, regardless of whether racial profiling data had been filled out. (*Id.*, pp. 45-48.) MCSO did not possess or maintain any such document, and was, therefore, obviously not obligated to provide one.[2] (*See id.*) Nevertheless, in the spirit of cooperation, MCSO employees and defense counsel worked with Plaintiff's counsel to create such a spreadsheet, which was provided to Plaintiff on January 2, 2011, under one month after Weech's deposition was completed. Amazingly, it is the production of this recently created spreadsheet that Plaintiff has the audacity to claim evinces a prior withholding of requested information. To the contrary, it is undeniable that Defendants not only fully complied with Plaintiff's discovery requests, but rather, went well beyond their discovery obligations in creating a spreadsheet that incorporated additional information Plaintiff wanted; information that was first requested informally and verbally during Weech's deposition on December 6, 2010. Rest assured, as a result of this

---

[2] Further, in August 2010, Defendants allowed Plaintiff to review the hard copies of every traffic ticket issued in 2007 and 2008 by all MCSO deputies, regardless of whether racial profiling data had been completed. Plaintiff was allowed to flag any ticket he wished for copying. MCSO employees then copied the tickets and provided Plaintiff everything he requested. Accordingly, Plaintiff's offensive claim that this information was withheld from him is sanctionable itself.

4

classic example of no good deed going unpunished, that was the last time Defendants will offer Plaintiff any assistance beyond the parameters of their legal obligations. Indeed, Defendants defy Plaintiff to identify any discovery request which Defendants did not fully comply with in this litigation.

### II.   PLAINTIFF IS NOT ENTITLED TO RE-DEPOSE DEFENDANTS.

Plaintiff alleges he has some new secret trial strategy based on the spreadsheet created in January and, therefore, needs to re-depose at least six (6) people.[3] (Pl.'s Motion to Compel, ¶¶ 6, 7.) This contention merits short shrift. Initially, Plaintiff chose to squeeze all of his discovery into the last few months of an extremely lengthy discovery period, and has already benefitted tremendously from the seven discovery extensions the Court has allowed every time Plaintiff fabricates a new explanation for being unable to complete his work. In that regard, Plaintiff has never offered any plausible explanation for ignoring this case for more than a year and a half before deciding to start working on it.

More importantly, he has offered no plausible explanation for needing to re-depose Defendants whose depositions he has already completed. As explained above, his contention that Defendants had withheld relevant information is pure sophistry. Further, his contention that the new spreadsheet requires additional depositions of Defendants is an obvious fabrication given that, when he first deposed Defendants Nygren and Lutz, Plaintiff did not even ask them any questions about statistical analysis or systematic racial profiling.

---

[3] Plaintiff further asks for leave to file an amended Complaint based on his "new" strategy. His request is cryptic at best and does not comply with the Federal Rules of Civil Procedure. Regardless, for the reasons stated below, Defendants have fully complied with discovery and Plaintiff should not be granted leave to file an amended Complaint nearly two years after he filed his initial complaint.

Moreover, with respect to Defendants Seith's and Cundiff's depositions, and per this Court's order, Plaintiff still has one and a half (1.5) hours remaining with Seith and three (3.0) hours with Cundiff. (*See* Correspondence from Barton, attached hereto as "Exhibit C;" Order, Dkt. No. 153.) Plaintiff is free to ask them any relevant questions during the remaining time. He has provided no new justification for further extending these already lenient time periods.

Plaintiff also seeks to re-depose Deputy Jeremy Bruketta, whose deposition was already completed as well. (Pl.'s Motion to Compel, ¶ 9.) In support, Plaintiff contends Bruketta admitted during his deposition to falsifying 140 tickets, and that he has now discovered 100 additional falsifications. (*Id.*, ¶ 8.) In reality, Bruketta did not admit to falsifying tickets, but rather, testified he was led to believe he should mark every driver as Caucasian, unless through conversation, it became absolutely clear the person was Hispanic. (*See* Transcript of Bruketta's Deposition, attached hereto as "Exhibit D," pp. 35-37.) There is some support for Bruketta's apparent mis-interpretation of his obligations, given that an analysis of his warnings and stop cards (instances in which he has given drivers breaks instead of citations), reflect that he was marking apparently Hispanic drivers as Caucasians, at roughly the same rate as when he was issuing citations. In any event, whether Bruketta's interpretation was sufficient does not depend on whether there are 140 or 240 instances of apparent mis-markings, and Plaintiff has not demonstrated any basis for re-deposing a non-party witness whose deposition has been completed.

### III. THERE IS NO BASIS TO FURTHER EXTEND OR STAY DISCOVERY PENDING THE RESULTS OF AN INTERNAL REVIEW.

Plaintiff inaccurately states that MCSO initiated a "new" racial profiling investigation on January 14, 2011 and that 51 officers are now being investigated for racial profiling. (Pl.'s

Motion to Compel, ¶¶ 1, 9; Pl.'s Motion for Sanctions, ¶ 2.) Plaintiff also flagrantly claims that "filings with this Court and newly developed public scrutiny have forced Defendants to re-evaluate their prior misrepresentations." (Pl.'s Motion to Compel, ¶ 1 n.1.) These statements are false and reflect the problems when litigants rely on inaccurate leaked information about confidential internal investigations in order to advance their interests in unrelated litigation.

In order to set the record straight, the pending internal investigation was not started on January 14, 2011, but rather was initiated in November 2010 after it was discovered, as a result of this litigation, that there were significant issues relating to Deputy Bruketta's documentation of drivers' races during traffic stops. Plaintiff knew about this investigation as early as Lieutenant Miller's deposition on December 6, 2010, when the issue was discussed with the Court, so it is curious that he states the investigation started last week.

In any event, since the investigation began, the MCSO has compared all MCSO deputies' percentages of stops of Hispanic and African-American drivers for the years 2007-2009, and the results of those stops, against internal benchmarks which IDOT has already deemed to be appropriate, to determine the number of deputies who issued tickets to Hispanic or African-American drivers at a rate of more than 5% above the department benchmark. Rather than constitute evidence of racial profiling, those percentages simply resulted in those deputies being flagged for interviews to explore the myriad of potential reasons the numbers could legitimately be elevated, and whether there could be some indication of bias in their traffic enforcement.[4]

In addition, based upon Deputy Bruketta's apparent mis-marking of Hispanic drivers as Caucasian, the MCSO created a separate category for such mis-marks, and flagged for interviews

---

[4] In order to obtain a statistically significant sample, the department only flagged deputies who had sufficiently elevated percentages based upon at least 45 citations being issued in a given year.

all deputies who appear to have mis-marked more than 5% of Hispanic drivers (based solely on Hispanic-sounding surnames) as Caucasian. And finally, the MCSO created a category for failing to complete racial profiling data at all, and flagged for interviews those deputies who failed to complete the data in over 5% of their stops, again based upon the issuance of at least 45 tickets in a given year. Notably, such a failure, when it is not combined with a high overall percentage of minority citations, is evidence of administrative non-compliance, requiring re-training, rather than racial profiling. As a result of this analysis, the MCSO intends to interview approximately 40 officers, and has not reached any conclusions as to whether any deputy has engaged in racial profiling. Thus, this internal review is in the fact-finding stage, and for Plaintiff to front the pending inquiry as proof of racial profiling based on some unfortunate leak of information is further evidence of Plaintiff's reckless and irresponsible approach to this litigation over the past six months.

     Critically, the current internal review has nothing to do with any of the topics raised in Plaintiff's Complaint, specifically whether Plaintiff was retaliated against for complaining about racial profiling in 2008. Neither in his Complaint nor in his deposition did Plaintiff ever complain about the topics that are currently under review by the MCSO. He never mentioned the possibility that any deputy was mismarking drivers' races on tickets, he never complained that deputies were not completing racial profiling data on tickets, and he never even mentioned Deputy Bruketta until the day **after** he was placed on administrative leave. To the contrary, his Complaint states that he complained in a climate assessment questionnaire that "civil rights violations were rampant," that he told Cundiff, Seith, and Popovits that he believed deputies were engaged in racial profiling, and that he wrote a memorandum to his supervisors that he heard deputies were stopping people for "driving while black" and overheard others making

racial slurs. (*See* Complaint, Dkt. No. 38, ¶¶ 19-24.) Similarly, when asked about his complaints in his deposition, Plaintiff confirmed that his complaints were based upon his concerns about the manner in which Deputies Jones and Stevens initiated traffic stops and made arrests, that Deputy Milliman had possibly used excessive force on at least one occasion, and that Deputy Cosman may have used a racial slur. (*See* Transcript of Seipler's Deposition, attached hereto as "Exhibit E," pp. 167-70, 175-76, 183-84.) He further testified that he discussed with fellow deputies that it was "peculiar" how "Jones, Stevens, Muraski, Falb" were able to arrest more Hispanic drivers than everyone else, and that Milliman had possibly violated individuals' civil rights. (*Id.*, pp. 175-76.) Accordingly, the fact that information surfaced in this litigation that led the MCSO to conclude it needed to review specific practices by deputies is not even arguably relevant to Plaintiff's complaint that he was retaliated against in 2008 for complaining about his concerns regarding Deputies Jones, Stevens, and Milliman.

  The first time Plaintiff ever mentioned Bruketta to his supervisors was on July 22, 2008, the day after Plaintiff was placed on administrative leave for allegations which ultimately resulted in his termination. (*See* Correspondence from Seipler, attached hereto as "Exhibit F.") All Plaintiff stated in correspondence on that date was that the department should focus "scrutiny" on Bruketta because he had "an abnormally high arrest rate" and may have used excessive force on at least one individual. (*Id.*) Critically, while Plaintiff was employed, he never complained to his supervisors that Bruketta engaged in racial profiling, and more specifically, never complained that Bruketta, or anyone else for that matter, mislabeled driver's races. In fact, the first time the department ever had any reason to believe that Bruketta or any other deputy was mis-documenting drivers' races' was in October 2010, when it was accumulating documentation in response to Plaintiff's discovery requests. Plaintiff's allegation

9

is that he was retaliated against for complaining that certain deputies, specifically Deputies Jones, Stevens, Cosman, and Milliman, engaged in racial profiling or civil rights violations. (Complaint, Dkt. No. 38, ¶¶ 78.) While this Court concluded Plaintiff's July 22, 2008 memo permitted him to examine data concerning Bruketta, such an allowance is a far cry from allowing a stay of discovery pending the results of an internal review, which was inspired by and focused on allegations that were never raised by Plaintiff at any time prior to the institution of this litigation. The pending internal review has no bearing on any salient issue here, and Plaintiff cannot demonstrate it warrants a stay of discovery.

Ironically, it was Defendants who, in September 2009, moved the District Court to stay discovery pending the resolution of the related state court proceedings. (Dkt. No. 52.) That request was denied, and on November 18, 2010, the Court ordered discovery to proceed. (Dkt. Nos. 61, 62.) From that time forward, Defendants diligently pursued discovery, completing nearly all of their required depositions by June 2010. During that time, Plaintiff did virtually nothing. Beyond issuing written discovery, Plaintiff did not notice or conduct a single deposition until July 2010, approximately 18 months after this suit was filed. Now, faced with the seventh discovery deadline, Plaintiff seeks a stay based on a completely unrelated pending departmental review without even offering a single legal argument why a stay is appropriate in this instance. As such, this Court should deny Plaintiff's request to extend or stay discovery.

**IV. DEFENDANTS ARE ENTITLED TO SANCTIONS AGAINST PLAINTIFF FOR PRESENTING A FRIVOLOUS MOTION FOR SANCTIONS**

First, Plaintiff asks this Court to impose sanctions on Defendants for "tendering incorrect data" and hiding racial profiling data. (Pl.'s Motion for Sanctions, ¶¶ 6, 10.) However, Plaintiff knows this claim is blatantly false. In fact, Plaintiff recognizes that defense counsel has not

10

caused the faulty discovery disclosures, but rather he "believes" that the Defendants have "intended this result." (Pl.'s Motion for Sanctions, ¶ 5 n.4.) As explained above, Defendants fully complied with Plaintiff's discovery requests over a year and a half ago and recently produced another a spreadsheet, which did not exist until MCSO created it for him. Proving that no good deed goes unpunished, Plaintiff wants sanctions imposed on Defendants for creating and producing this spreadsheet.

Second, without any basis in fact, Plaintiff claims Defendants released Milliman's deposition transcript to the editor of a local newspaper and that since it is under the Protective Order, Defendants should be subject to sanctions. (Pl.'s Motion for Sanctions, ¶ 11 n.6.). This contention is truly beyond the pale for two equally compelling reasons. First, Milliman's testimony does not fall within the purview of the Protective Order, nor did Plaintiff ask for an agreement during Milliman's deposition that the transcript be sealed or confidential. (*See* Amended Agreed Protective Order, Dkt. No. 94.)

Second, Defendants did not release the transcript to the media. Since the article was published on January 5, 2011, defense counsel has told Plaintiff's counsel on numerous occasions that neither defense counsel nor any Defendant provided the transcript to the newspaper, to which Plaintiff's counsel responded that Defendants were the only party that ordered a copy a transcript. Defense counsel later learned from Jenson Reporting Agency that Plaintiff ordered a copy of the transcript on November 30, 2010. In an effort to avoid any further slanderous accusations, Defendants have attached affidavits, which clearly establish that no one at the MCSO released the transcript to the editor of the Northwest Herald. (*See* Affidavits of Cundiff, Miller, Lutz, Nygren, Popovits, Ellis, and Zinke, collectively attached hereto as "Exhibit G.")

Finally, the irony of Plaintiff seeking sanctions because one newspaper appears to have recognized the preposterous nature of Milliman's ramblings is too much to take. Plaintiff has been the one from the beginning who made Milliman's testimony public in his campaign to harass and embarrass Sheriff Nygren. Indeed, Plaintiff filed a "Motion for Leave to Supplement Third Amended Petition to Appoint a Special Prosecutor" in state court on December 27, 2010, which included the same accusations against Sheriff Nygren that Milliman made in his deposition and attached the transcript of proceedings before this Court on December 15, 2010, wherein Milliman's testimony was discussed. (*See* Motion, attached hereto as "Exhibit H.") Plaintiff also included details of Milliman's deposition in his Motion to Extend, which he argued should be filed in the public domain.[5] Finally, Plaintiff argued in his *Memorandum in Support of the Filing of the Motion to Extend Discovery into the Public Record*, that his Motion to Extend was "presumptively 'open to public inspection.'" (Dkt. No. 160-1.) Against that backdrop, it is the height of hypocrisy for Plaintiff to insist that Milliman's nonsensical ramblings should be available to the public in a smear campaign against Sheriff Nygren, while arguing, as he does here, that the release of Milliman's testimony violated the Protective Order, which did not even cover the testimony.

In short, Plaintiff's Motion for Sanctions and request for an order for Rule to Show Cause is entirely baseless. As explained above, Plaintiff knows Defendants have complied with discovery to the fullest extent, and his argument to the contrary is clearly designed to harass, cause unnecessary delay, and needlessly increase the cost of litigation. *See* FED. R. CIV. P. 11(b)(1). Therefore, Defendants respectfully request this Court impose sanctions on Plaintiff for

---

[5] Although the Court granted Plaintiff's Motion, to date, he has not filed his Motion to Extend in the public record. (*See* Order, Dkt. No. 165.)

their attorneys fees and costs incurred in defending against this clearly frivolous motion. *See Foy v. First Nat'l Bank of Elkhart*, 868 F.3d 251, 258 (7th Cir. 1989) (holding that "a frivolous request for sanctions is itself sanctionable"); *see also Leoco v. Caribe Crown, Inc.*, 571 N.E.2d 759, 760-61 (Ill. App. Ct. 1991) (collecting federal cases that recognize a motion for sanctions is subject to the provisions of Rule 11).

## CONCLUSION

For the reasons stated above, Defendants respectfully request this Court deny Plaintiff's Motion to Compel and Motion for Sanctions, and assess sanctions against Plaintiff for filing a frivolous motion for sanctions.

Dated: January 20, 2010                             Respectfully submitted,

/s/Elizabeth K. Barton
Elizabeth K. Barton, Attorney No. 06295848
*One of Attorneys for Defendants*

James G. Sotos
Elizabeth K. Barton
ebarton@jsotoslaw.com
JAMES G. SOTOS & ASSOCIATES, LTD.
550 East Devon Avenue, Suite 150
Itasca, Illinois 60143
(630) 735-3300
(630) 773-0980 (fax)

## **CERTIFICATE OF SERVICE**

       I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on Thursday, January 20, 2011, I electronically filed the foregoing **Defendants' Response to Plaintiff's Motions to Compel and for Sanctions** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Blake Wolfe Horwitz
Uma Bansal
The Blake Horwitz Law Firm
20 South Clark Street
Suite 500
Chicago, IL 60603
312-616-4333
312-372-7076 (fax)

                                                Respectfully submitted,

                                                /s/Elizabeth K. Barton
                                                ELIZABETH K. BARTON, Atty. No. 06295848
                                                *Attorney for Defendants*