*Seipler v. Cundiff, et al.*
Case No. 08 CV 50257

**Exhibit H**

## IN THE CIRCUIT COURT OF THE TWENTY SECOND JUDICIAL CIRCUIT
## MCHENRY COUNTY ILLINOIS

**FILED**

**DEC 27 2010**

KATHERINE M. KEEFE
McHENRY CTY. CIR. CLK.

Zane R. Seipler

v.

County of McHenry

Case No.: 10MR000011

JUDGE MEYER

---

## NOTICE OF MOTION

On ___Jan 06, 2011___ at ___10:00 a___, or as soon thereafter as counsel may be heard, I shall appear before the Honorable Judge Meyer and shall then and there present the attached Motion for Leave to Supplement Third Amended Petition to Appoint a Special Prosecutor.


TO: McHenry County State's Attorney
    2200 Seminary Drive
    Woodstock, Il 60098

IN THE CIRCUIT COURT OF THE TWENTY SECOND JUDICIAL CIRCUIT
MCHENRY COUNTY ILLINOIS

**FILED**

DEC 27 2010

KATHERINE M. KEEFE
McHENRY CTY. CIR. CLK.

ZANE R. SEIPLER

v.

COUNTY OF MCHENRY

Case No.: 10 MR 000011

JUDGE MEYER

## MOTION FOR LEAVE TO SUPPLEMENT THIRD AMENDED PETITION TO APPOINT A SPECIAL PROSECUTOR

NOW COMES the Petitioner, ZANE SEIPLER, a citizen of the State of Illinois
and a resident of McHenry County, by and through his attorney, Blake Horwitz, Esq. and
moves this Honorable Court to appoint a Special Prosecutor in the above-captioned
matter, and in support thereof states as follow:

Pending before this Court is a Petition to Appoint a Special Prosecutor with
regard to theft of services concerning the illegal use of the Seven Point Star for both
political and official purposes. New allegations have now surfaced warranting the
supplementation of the record with additional data in support of the pending Petition.

Since the most recent hearing in this cause, a transcript of a federal civil rights
action involving Sheriff Nygren, has become publicly available.[1] The transcript discloses
statements made by Deputy Scott Milliman, a 15-year veteran of the McHenry County
Sheriff's Department, which reveal previously secret criminal conduct by Sheriff Nygren.

---

[1] The transcript contains the proceedings of a court hearing before Federal Magistrate Judge Mahoney of
the Northern District of Illinois held on December 15, 2010 in a cause entitled *Seipler v. Cundiff, et. al.,*
Case No. 8 C 50257. The transcript of this hearing is attached hereto as Exhibit A.

1

Specifically, the transcript discloses deposition testimony by Deputy Milliman in *Seipler v. Cundiff, et. al.*, regarding criminal activity by Sheriff Nygren to which Mr. Milliman was a witness. The transcript also establishes that a code of silence exists in the McHenry County Sheriff's Department and discloses that seven other officers set forth that that they will be retaliated against if they break this code. The transcript also reveals that Sheriff Nygren was observed to have committed and/or participated in the following:

- Engaged in "Solicitation of Murder," in violation of 720 ILCS 5/8-1;

- Facilitated and promoted the trafficking of illegal aliens from Mexico to McHenry County, in violation of 720 ILCS 5/8-2 and the Federal Immigration and Nationality Act (8 U.S.C. § 1324(a)(1)(A)(iv)(b)(iii));

- Covered up racial profiling in the McHenry County Sheriff's Department where at least one member in 2008 falsified the race of Hispanics drivers on at least 140 occasions, in violation of 720 ILCS 5/8-2.1; and

- Participated prior to 2007 in a pay-off scheme with a member of the McHenry County State's Attorney Office, whereby pending criminal prosecutions were dropped as *nolle prosequi* in exchange for money, in violation of 720 ILCS 5/33-1 and 720 ILCS 5/33-2.

The specific facts attesting to the criminal allegations noted above are subject to a protective order in *Seipler v. Nygren, et. al.*, and therefore are not publicly available. Hence, Petitioner cannot tender these additional facts to this Court at present, but can and does refer to the publicly-available hearing transcript discussed above.

### Other Information in the Public Domain

There is one other item of information that is in the public domain regarding Sheriff Nygren's alleged criminal participation in a conspiracy to murder: Deputy Milliman testified that one victim of attempted murder was a political adversary of Sheriff Nygren.

2

With regard to the trafficking of illegal aliens, it is well-established that Sheriff Nygren developed an exchange program between a local police department from Zacatecas, Mexico and McHenry County. McHenry County deputies travelled back and forth to Mexico. Petitioner has sound reasons to believe that this exchange program facilitated the transportation of illegal aliens to McHenry County.

With regard to the pay-off scheme (money for case dismissals), if current members of the McHenry County State's Attorney Office were also involved in this scheme, it would be prudent for this Court to appoint a Special Prosecutor to investigate this matter on behalf of the People.[2]

Lastly, given the gravity of the offenses that have been alleged by Deputy Milliman, it would be in the best interest of McHenry County for an independent Special Prosecutor to further investigate these matters.

WHEREFORE, Petitioner respectfully requests that this Honorable Court appoint a Special Prosecutor to investigate allegations of criminal wrongdoing by Sheriff Nygren.

Blake Horwitz
Attorney on Behalf of Petitioner

The Blake Horwitz Law Firm, Ltd.
Blake Horwitz, Esq.
20 S. Clark St., #500
Chicago, Illinois 60603
312-676-2100

---

[2] The appearance of impropriety mandates the appointment of a special prosecutor. *See People v. Lang*, 805 N.E.2d 1249, 346 Ill.App. 3d 677 (2nd Dist. 2004); *In re Guardianship of Angell*, 26 Ill.App.2d 239, 243 (State's Attorney has an allegiance to the People); *Fleming v. Kane County*, 1986 WL 1414 (N.D.Ill. 1986) (*accord*).

# EXHIBIT A

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         WESTERN DIVISION

 3     ZANE SEIPLER,                )   Docket No. 08 C 50257
                                    )
 4                     Plaintiff,   )   Rockford, Illinois
                                    )   Wednesday, December 15, 2010
 5            v.                    )   2:45 o'clock p.m.
                                    )
 6     CAPTAIN ANTON CUNDIFF, et    )
       al.,                         )
 7                                  )
                       Defendants.  )
 8
                       TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE P. MICHAEL MAHONEY

10     APPEARANCES:

11     For the Plaintiff:        THE BLAKE HORWITZ LAW FIRM, LTD.
                                 (20 S. Clark Street,
12                               Suite 500,
                                 Chicago, IL  60603) by
13                               MR. BLAKE WOLFE HORWITZ

14     For the Defendants:       JAMES G. SOTOS & ASSOCIATES, LTD.
                                 (550 E. Devon,
15                               Suite 150,
                                 Itasca, IL  60143) by
16                               MR. JAMES G. SOTOS

17     Court Reporter:           Mary T. Lindbloom
                                 211 South Court Street
18                               Rockford, Illinois  61101
                                 (815) 987-4486
19

20

21

22

23

24

25
```

2

```
 1         (The following is from a tape recording of proceedings:)

 2              THE COURT:  All right.  08 C 50257, Seipler v. Cundiff.

 3     Good afternoon, counsels.

 4              MR. HORWITZ:  Good afternoon, Judge.

 5              MR. SOTOS:  Good afternoon, your Honor.  Jim Sotos for

 6     the defendants.

 7              MR. HORWITZ:  Blake Horwitz for the plaintiff.

 8              THE COURT:  All right, counsels.  I've got a lot of

 9     material here.  Why don't you just start off with tell me where

10     you think everything's at this point in time.  Three minutes,

11     though.  Tell me where you think you're at.

12              MR. HORWITZ:  With regards to the status of discovery?

13              THE COURT:  Status of discovery, where you think the

14     case is going, what order you want me to take these motions on,

15     anything you want to talk about.  This should be just Merry

16     Christmas to you.

17              MR. HORWITZ:  Three minutes.  Is it like a lawyer's --

18     is it a lawyer's three minutes, or are we talking --

19              THE COURT:  Well, you've already used up 15 seconds.

20     See, that's always a mistake.

21              MR. HORWITZ:  All right.  So, generally speaking, we

22     are prepared to be, I would say, close or at the end of

23     discovery as of today.  And as you read in the motion, which

24     there's an issue about it being under seal, which we need to

25     address.  So, that's question mark number one.  Where Deputy
```

3

1  Milliman came forward and articulated that there was a long line
2  of criminal activity that Sheriff Nygren was involved in. Some
3  of the criminal activity would be 404(b) evidence. Other
4  criminal activity would be 608 evidence.
5       Targeted criminal activity concerns the conduct of
6  Sheriff Nygren and a gentleman by the name of Jose Rivera, which
7  has an established -- have established connection with the two
8  of them. In fact, they've recently gone on a meeting over in
9  federal court, believe it or not, with Judge Kapasa (phonetic),
10 within the last week. So, they have a tight connection, the
11 three of them -- the two of them, excuse me -- Jose Rivera and
12 Sheriff Nygren and the criminal activity that they were engaged
13 in.
14       One was to bring Hispanics undocumented over to McHenry
15 County, actually to a particular apartment complex called the
16 Stonelake apartment complex. That apartment complex is a place
17 where officers engage in racial profiling. The officers that
18 engage in racial profiling, the evidence would be, are Bruketta
19 and Jones, the officers that we've talked about.
20       THE COURT: Wait a minute. You mean they lived there
21 or what?
22       MR. HORWITZ: No. Stonelake Apartments is a place
23 where many, many, many Hispanics, if not mostly Hispanics, live.
24 I haven't taken a poll. But my client actually lives very close
25 to there, and the facts are that it's a place where there's a

4

1  very high percentage of Hispanics that live there, a very, very
2  high percentage.
3       THE COURT: What's this got to do with Bruketta?
4       MR. HORWITZ: Bruketta and Jones, especially Jones,
5  there's evidence that those officers actually stopped their
6  vehicle at that location where the Stonelake Apartments are with
7  the intention of developing a high number of arrests, which they
8  benefit from, high number of arrests, and the arrests that they
9  seek to undertake are those with regard to Hispanics. So,
10 that's racial profiling.
11       THE COURT: And they benefit because they advance as
12 far as the Sheriff's Department --
13       MR. HORWITZ: Yes.
14       THE COURT: -- is concerned or they get priority as far
15 as picking vacation days or something like that?
16       MR. HORWITZ: Officer Bruketta, for example, he was on
17 the department I believe for a year or a little bit less than a
18 year, and his promotion was -- and his self articulated
19 promotion, meaning in his deposition said by being active
20 performing arrests, generating lots of tickets, etc., I became a
21 K-9 officer. That is a promotion at the department. So, each
22 officer, though he's not a sergeant, which we wouldn't actually
23 consider -- I wouldn't actually consider to be a promotion --
24       THE COURT: How does that come in? Your case that
25 you've got pending here claims that your client's First

PDF created with pdfFactory trial version www.pdffactory.com

5

1  Amendment rights were violated because he complained publicly,
2  which is what he'd have to, about racial profiling and got fired
3  because of that, right?
4      MR. HORWITZ: Yes. He went to the Illinois State
5  Police, FBI, the EEOC, his supervisors, etc., yes.
6      THE COURT: All right. Then he gets at least
7  retaliated against. Okay?
8      MR. HORWITZ: Job demotions and termination.
9      THE COURT: That's right. Now, now you're sliding over
10 and talking about this illegal activity. Now, the only way I
11 can think that you can even try to connect this up with your
12 lawsuit is to say what? One of the reasons the sheriff was so
13 sensitive about this issue was because of this alleged illegal
14 conduct, and so that's why he fired your guy? In other words,
15 counsel --
16     MR. HORWITZ: That is one of the bases.
17     THE COURT: Well, how does it fit into your lawsuit at
18 this point? Your guy has a relatively straightforward lawsuit.
19 He says, "I saw racial profiling. I thought it was wrong. I
20 complained about it. I went outside. I broke the code. And
21 because of that, I was trampled on," right?
22     MR. HORWITZ: Yes.
23     THE COURT: All right. Now, what does this other stuff
24 have to do with it?
25     MR. HORWITZ: If Sheriff Nygren was involved in this

6

1  criminal activity, as this 15-year veteran states -- okay?
2      THE COURT: Yeah. You're going to try to get it in as
3  other bad acts?
4      MR. HORWITZ: No. Not as propensity. Not --
5      THE COURT: Well, you said 404(b).
6      MR. HORWITZ: 404(b) allows for motive and intent.
7      THE COURT: All right. And the motive is going to be
8  that this is all part of a vast conspiracy and that the reason
9  he fired your guy was to protect his own criminal activity.
10     MR. HORWITZ: More specifically. Not just the concept
11 of criminal activity as a general concept.
12     THE COURT: Yeah.
13     MR. HORWITZ: And, by the way, there's many, many, many
14 factual patterns. I've addressed as many as I could in the
15 motion that were pertinent.
16     THE COURT: Okay.
17     MR. HORWITZ: But the targeted focus is that there were
18 a number of things that Sheriff Nygren was doing with regards to
19 Hispanics Deputy Milliman says in the recent testimony, and the
20 two or three things that he was doing that relate to Hispanics,
21 two of them -- there are three things that we've set forth in
22 the motion.
23     THE COURT: Right.
24     MR. HORWITZ: Two of them are relatively meaningful as
25 it relates to racial profiling. One is that they were actually,

7

1   for the sake of a -- I've got to short circuit. You know,
2   shorten what I'm saying. Let's just say he's sort of filling up
3   the Stonelake Apartments from Mexico, meaning illegal
4   trafficking of Hispanics from Mexico.
5           THE COURT: For what? Why is he doing it?
6           MR. HORWITZ: Because him and Jose Rivera, Deputy
7   Milliman states, received a financial benefit.
8           THE COURT: Because?
9           MR. SOTOS: Kickbacks, he says.
10          MR. HORWITZ: Because Jose Rivera received money.
11          THE COURT: Because the Hispanics would pay them if
12  he'd protect them?
13          MR. HORWITZ: Yeah. The traditional coyote scheme,
14  which is somebody transports them --
15          THE COURT: All right.
16          MR. HORWITZ: Now, this is what Deputy Milliman says,
17  Judge.
18          THE COURT: Yeah, but it's not what your guy complained
19  of.
20          MR. HORWITZ: That's not -- okay. I'm just giving you
21  the two scenarios.
22          THE COURT: Well, but I'm just saying, you know --
23          MR. HORWITZ: Let me try then.
24          THE COURT: It's a stretch to get this to tie into your
25  case, particularly since I've got an '08 case and I'm at the

8

1   end.
2           MR. HORWITZ: Let me continue to tie it in, if I could,
3   okay?
4           THE COURT: I'm waiting.
5           MR. HORWITZ: Okay. So, first of all -- so, there's
6   two other central issues. Officers Jones and Bruketta,
7   specifically Jones, would go to the Stonelake Apartments, wait
8   for a traffic violation because they believed or he believed --
9   at a minimum I know that there's evidence relative to Jones --
10  that it is at that location where he can get arrests. It is
11  through getting arrests that the officers are promoted.
12          For example, just so you understand, Sheriff Nygren
13  would generate a list. Now, sidetracking from arrests with
14  regards to tickets, Sheriff Nygren would generate a list. If
15  you get 20 more tickets, you are then put on a letter that we
16  publicly -- Sheriff Nygren publicly displays, and in that letter
17  it identifies all the officers, how many arrests did they get --
18  excuse me -- how many tickets they got, and that sort of getting
19  on that list is what provides for promotions, provides for a pat
20  on the back, doing a good job.
21          THE COURT: But, you see, there's a slight
22  inconsistency here in what you're saying. On the one part
23  you've told me that basically -- and I know you're saying that
24  you have information that shows this. I'm sure you're not
25  accusing Sheriff Nygren at this point.

9

```
 1         But one thing you're showing that -- you're claiming
 2    that Sheriff Nygren has a benefit of protecting illegal
 3    Hispanics and putting them into the house and getting some type
 4    of kickback.  On the other hand, you're telling me that people
 5    are hanging around this place that are friends of Sheriff Nygren
 6    arresting them so that, in fact, they can move up, as far as
 7    this list is concerned, which means he's not doing much
 8    protection as far as these people are concerned if he's got his
 9    officers out there arresting them.
10         MR. HORWITZ:  I didn't say that he was intending to
11    protect them.  There is another scheme.  There is another
12    scenario.  Whether or not he chooses to intellectually analyze
13    what he's doing and his course of conduct, and I understand what
14    you're saying, but --
15         THE COURT:  Did Milliman really say this stuff?
16         MR. HORWITZ:  Judge, this is what he said under oath.
17    And to be clear, Judge --
18         THE COURT:  Now.
19         MR. HORWITZ:  Judge, to be clear, he also said under
20    oath --
21         THE COURT:  Okay.  No.  Keep going.  I'm listening.
22         MR. HORWITZ:  -- that he's in fear of his life.  Okay.
23    He looked at us straight in the eyes, both the defense attorney
24    and myself, with eyes red -- and, you know, I'm telling you what
25    this man said, and he has been, Judge -- he is presently telling
```

10

```
 1    his story, and this matter is being investigated with the
 2    Illinois State Police.  He's previously been with the FBI.  So,
 3    when I say these things to you, I'm not just saying there's just
 4    this half-cocked guy telling a story.
 5         THE COURT:  I understand, and that may be another case.
 6    The only thing I'm stopping you on and that I have a problem
 7    with is it's tangential as to this case.
 8         MR. HORWITZ:  I'm just saying that to you not to say
 9    that I am here as an AUSA.  I am saying this to you because it
10    just goes to certain concepts attributable to credibility versus
11    just some knucklehead flying off the handle and just saying
12    things.  That's all I'm saying.  It's just a credibility issue.
13         THE COURT:  Yeah, I know.  You told me 404, 608.  But
14    I'm going --
15         MR. HORWITZ:  No, no.  Credibility as to Milliman,
16    Deputy Milliman.  In other words, you said did he really say
17    these things, and I'm saying to you yes, he did.
18         THE COURT:  Well, I wasn't there.  That's the only
19    reason I asked that.
20         MR. HORWITZ:  Okay.  He's not denying it.
21         MR. SOTOS:  He said the sheriff told him to murder
22    somebody, too.  He said a lot.  He said the things that
23    Mr. Horwitz said he said, and he said the sheriff told him to
24    push a guy in front of a train who was a political opponent and
25    that he told him to hang another guy and make it look like a
```

11

1  suicide.  And he said some of the stuff that Mr. Horwitz said,
2  too.  And I guess -- I don't know if counsel wasn't done.  So,
3  I'll --
4          THE COURT:  No, that's okay, counsel.
5          MR. HORWITZ:  Just to be clear, Judge, he's a very
6  active member of the department.  He's been there about
7  15 years.  He's presently engaged in drug arrests and whatnot.
8  He's working very hard for the department right now.
9          THE COURT:  He's still working for the sheriff?
10         MR. HORWITZ:  Yes.  So, he's working --
11         MR. SOTOS:  Today he is.
12         THE COURT:  Any proceedings started against him?
13         MR. SOTOS:  I don't have -- I can't really comment on
14  what's going on internally, but we did provide the sheriff with
15  the deposition, Judge, and --
16         THE COURT:  That's not your business, anyhow, now that
17  I think about it.
18         MR. SOTOS:  Right.  That's how I'm looking at it.
19         THE COURT:  That's somebody else's business, as far as
20  that goes.
21         MR. HORWITZ:  Before the deposition, I looked at his
22  personnel file, any allegations lodged against him.  There's
23  nothing, except for maybe a couple times he didn't write a
24  report correctly.  So, that's it.
25         THE COURT:  All right.  Now --

12

1          MR. HORWITZ:  There's another scheme.
2          THE COURT:  What do you want to do?  What else do you
3  want to do so I can finally get this case -- I mean --
4          MR. HORWITZ:  Do you want me to tell you the other
5  scheme or no?
6          THE COURT:  No.
7          MR. HORWITZ:  Okay.
8          THE COURT:  Tell me what do you have to have until you
9  can try this case.  Let's try this case.
10         MR. HORWITZ:  The other issues that are outstanding are
11  you ordered the deposition of three individuals, Bruketta,
12  Jones, and Pyle.
13         THE COURT:  Right.
14         MR. HORWITZ:  Pyle is the gentleman that -- okay.  So,
15  the attorney for -- so, Bruketta and Jones, their depositions
16  went.
17         THE COURT:  Pyle did not.
18         MR. HORWITZ:  Pyle, his attorney offered December 22nd,
19  and I don't have confirmation from counsel.  I think yesterday
20  by e-mail I submitted it out to everybody, and I think -- I'm
21  going to guess that we're good on December 22nd, but I don't
22  have confirmation.
23         THE COURT:  What else do you need besides Pyle?
24         MR. HORWITZ:  Millimam's deposition to complete.  He
25  secured his own counsel.

13

```
1        THE COURT:  How many hours have you had with Milliman?
2        MR. HORWITZ:  Well, I think I probably have some
3   questions for about three hours or so, and defense counsel was
4   in the middle of asking questions.
5        THE COURT:  How much time do you need to clean up?
6        MR. SOTOS:  We just need a couple hours, Judge.  I'd
7   say three's plenty.  We had planned to finish his deposition in
8   accordance was this final deadline.  We were told -- we brought
9   Mr. Milliman in for his dep.  He said that he had secured
10  counsel.  So, we didn't take the dep.  We called his counsel,
11  who said that he has not talked to Deputy Milliman, doesn't know
12  what he's talking about.  So, that's the one thing that we
13  weren't able to get done by the 15th.
14       THE COURT:  Did Deputy Brubetta actually say that he
15  misidentified 140 individuals as Caucasians in 2003?
16       MR. SOTOS:  That's being looked into right now, too,
17  Judge.  But he did say --
18       MR. HORWITZ:  The answer is yes, Judge.
19       MR. SOTOS:  I don't know if he said 140 or not, but he
20  may -- I know that he said that there was a whole host of people
21  who appeared to be Hispanic surnames.  Many of them just spoke
22  Spanish, and they were marked as Caucasian on tickets.
23       THE COURT:  Now --
24       MR. HORWITZ:  Judge, just so you know --
25       THE COURT:  I'll get back to you.
```

14

```
1        MR. HORWITZ:  -- I don't say things that aren't
2   straight on the record.
3        THE COURT:  No, no.  I'll get back to you.  I just --
4   I'm asking.
5        Now, do you have any other deputies that hit numbers
6   like that?  Has anything in discovery shown someone else that
7   misidentified that many people?
8        MR. SOTOS:  No.
9        MR. HORWITZ:  No.
10       THE COURT:  I mean, because that seems -- the reason
11  I'm asking, counsel.  I'm not a deputy.  I'm not in sheriffs'
12  departments.  I don't know.  Maybe people just don't pay
13  attention when they mark these boxes.  I mean, is this something
14  that you would consider -- not to bind your client, not to make
15  an admission.
16       MR. HORWITZ:  Sure.
17       THE COURT:  But would you consider it average for --
18  not to be used by you.  Okay?  Average --
19       MR. HORWITZ:  Well, hold on a second.  Where do I put
20  this?  Where do I put what I learn right now?
21       THE COURT:  Yeah.  Well --
22       MR. HORWITZ:  I could put it in a vault somewhere?
23       THE COURT:  Then I'm not going to ask you the question.
24       MR. HORWITZ:  Okay.  Do you want to go off the record?
25       THE COURT:  All right.  Then I won't ask the question.
```

PDF created with pdfFactory trial version www.pdffactory.com
PDF created with pdfFactory trial version www.pdffactory.com

No, no. I won't ask the question. I'll just state it. Seemed high to me. Okay? What else do you need?

MR. SOTOS: It seemed high to the department, too, Judge. Probably leads to the next topic that he's raised.

THE COURT: Yeah. I don't even know how you do that, unless you're just sloppy.

MR. HORWITZ: Well, he was trained in March of '08. He admitted in his deposition he received his second bout of training attributable to how to properly mark tickets in March of '08, and it was after March of '08 where at least a hundred other tickets were marked incorrectly.

THE COURT: Okay. What else do you need? You've got Pyle. You've got three more hours to clean up Milliman.

MR. HORWITZ: There's a Ms. Weech, Mrs. Weech. I think it's Jan Weech.

THE COURT: Janet, I think. J-a-n-e-t.

MR. HORWITZ: Yes. Her deposition went, and she was a 30(b)(6) witness.

THE COURT: Yes.

MR. HORWITZ: During the deposition, defense counsel, his associate, agreed to a continuation for the deposition as a basis for one of her 30(b)(6) witness -- 30(b)(6) opinions, which is why documents were destroyed, and these documents that are destroyed are two forms that officers wrote relative to voided tickets.

THE COURT: What are you talking? Thirty minutes to wrap that up?

MR. HORWITZ: Maybe 45.

MR. SOTOS: Judge, if you notice on the motion, all of these depositions, for the most part, are depositions that have been started that never finished.

THE COURT: I see.

MR. SOTOS: But, you know, 45 minutes with Ms. Weech, we'll agree to that, Judge, because --

THE COURT: No. Thirty minutes. Thirty minutes you can wrap up Ms. Weech. Who else do you need?

MR. HORWITZ: By the way, I guess defense counsel is the one that wanted to continue on with Milliman. So, I'm not sure what -- the accusation you're throwing.

THE COURT: No, I understand. No, I didn't make any accusation, counsel. I'm sorry if you think I did. I put three hours down to Milliman because from what you've told me he said, giving counsel three hours to follow through on Deputy Milliman, that seemed reasonable to me. It seemed like he said a lot.

MR. HORWITZ: That's fine. No. So, three hours. I would like an opportunity to ask questions, as well.

THE COURT: I'll give you an hour.

MR. HORWITZ: All right. So, it's three on --

THE COURT: Three for him on Milliman. One for you for

17

1     rebuttal. I don't know what Pyle has set forth. I haven't put
2     a number on Pyle.
3          MR. SOTOS: You said two and a half hours, Judge. I
4     think you did put a number on that one.
5          THE COURT: All right. Two and a half on Pyle. Thirty
6     minutes on Weech. What else you got?
7          MR. HORWITZ: Given the testimony of Milliman, we did
8     issue subpoenas for Jose Rivera and Gary Pack. Jose Rivera is
9     the individual that engaged in the illegal scheme that would be
10    able --
11         THE COURT: Allegedly.
12         MR. HORWITZ: Yes. That would be able to articulate
13    the admissions by Sheriff Nygren as to many things. Do you want
14    me to go any further about that? Do you want me to argue as to
15    whether or not I should take his dep? I'm just telling you what
16    we have.
17         THE COURT: Well, why don't you argue, first of all, as
18    to why you should take his dep because, obviously, as you can
19    tell, I'm trying to wrap this up.
20         MR. HORWITZ: Sure.
21         THE COURT: And that's to -- hopefully to both your
22    clients' benefits to get this wrapped up, get by if we're going
23    to get a Rule 56, and get the case tried and find out what the
24    jury thinks of all this.
25         MR. HORWITZ: Jose Rivera would be able to -- Jose

18

1     Rivera is a business partner, the allegations run from --
2     alleged business partner of Sheriff Nygren.
3         THE COURT: All right.
4         MR. HORWITZ: That's what Deputy Milliman said. So, to
5    be clear, him, Deputy Milliman, Jose Rivera, and Sheriff Nygren
6    would sit in a room on many, many, many occasions, and they
7    would talk about what is going on. Okay?
8         THE COURT: That's what Milliman said?
9         MR. HORWITZ: Yes.
10        THE COURT: All right.
11        MR. HORWITZ: 2000, he said. 1999 and 2000. That's
12    when they had these conversations. And subsequently.
13        MR. SOTOS: That's not what he says.
14        THE COURT: That's okay.
15        MR. HORWITZ: So, and these are the things he said on
16    the record.
17        All right. So, there are three events, three instances
18    where Jose Rivera and Sheriff --
19        THE COURT: You got a Monell claim?
20        MR. HORWITZ: Yes.
21        THE COURT: Okay.
22        MR. HORWITZ: Do you want me to talk further?
23        THE COURT: No. That's where that fits, I assume. I
24    assume you're going to tell me it fits on the Monell claim.
25        MR. HORWITZ: It fits on the Monell claim. It also

19

1   fits potentially for 404(b) evidence and 608(b) evidence.
2       THE COURT: See, I think it's kind of hard to get
3   there, but --
4       MR. SOTOS: Judge, can I respond to this --
5       THE COURT: Yeah, you sure can.
6       MR. SOTOS: -- aspect of it? Because this is going to
7   require a little bit of background. I'll be as brief as I can.
8   You know, we conducted discovery because we took the court at
9   its word back a year and a half ago when we were told we were
10  supposed to do discovery by June of 2010. So, we did all of our
11  depositions by June of 2010 with the exception of one that
12  counsel kept canceling that was taken yesterday.
13      Then discovery started getting extended, and every time
14  we came here on the eve of a discovery close, we were first
15  told, well, now we have to do all this discovery into all of
16  these different other deputies at the Sheriff's Department and
17  turn over all their personnel files, which we did, thousands and
18  thousands of documents, which have not been mentioned ever since
19  then.
20      The next time discovery was supposed to close we were
21  told -- counsel came in here and said, "They gave us false
22  information in a spreadsheet. We found out that it was false.
23  They've withheld information," which we subsequently -- at the
24  time I didn't know what to say because it was sprung on me. I
25  said, "I don't know if there's anything inaccurate in there or

20

1   not." It turns out, and it's in our response in the motion,
2   there was nothing inaccurate with anything in the spreadsheet.
3   We provided exactly what was asked for, which were the racial
4   profiling statistics, and I'm sure we'll get to that at some
5   point.
6       And then now when we're on the close of discovery
7   again, we have a whole new criminal enterprise theory involving
8   Sheriff Nygren that he's requesting to do discovery into. Now,
9   that's Jose Rivera, who he doesn't allege is Sheriff Nygren's
10  business partner. He alleges that he is his partner in this
11  coyote scheme and this kickback scheme and in these murder plots
12  and all of this other stuff, which doesn't have anything to do
13  with this case.
14      And the fact that he says he has a Monell claim, I
15  would direct the court to paragraph 72, I think it is, of his
16  complaint where his Monell claim has about nine or ten different
17  subparts, and they all say the same thing, that the sheriff's
18  department did not adequately monitor, discipline, investigate
19  allegations of racial profiling and that they retaliated against
20  Mr. Seipler when he did in a number of different ways. By
21  taking him off the SWAT team, doing all the things they did that
22  ultimately led to his termination. That's it. That's what his
23  Monell claim says.
24      So, for him to just say, well, I have a Monell claim,
25  and that means that he -- because we're talking about a lot of

21

1   discovery. If we are really going to be required to defend
2   Sheriff Nygren on the allegations of Deputy Milliman that he was
3   involved in some criminal conspiracy involving illegal
4   trafficking of Hispanics over the last several years, that's
5   going to take a lot of work, and it doesn't have anything to do
6   with the lawsuit, Judge, and it doesn't have anything to do with
7   his Monell claim, either.
8           THE COURT: Well, I'll let -- it's closer to the Monell
9   claim than the lawsuit. Whether or not it really fits, I don't
10  know. But, counsel, you have to give me this. This has turned
11  out not to be the garden variety lawsuit as far as 1983 is
12  concerned. Every time I pick up this file, there's something
13  different that happens that I haven't seen before in any file.
14  That's why it's drawn out.
15          MR. SOTOS: That's because it comes up on the close of
16  discovery. There's this frenetic activity weeks before
17  discovery closes, and then we're in here defending entirely new
18  allegations, and this --
19          THE COURT: What am I supposed to with somebody that
20  misidentifies 140 individuals as Caucasian?
21          MR. SOTOS: Judge, I got it.
22          THE COURT: Am I supposed to be happy with that?
23          MR. SOTOS: Well, Judge, you know what? I'm not happy
24  with that, but that's not -- in the first place, we're not even
25  arguing about that, about him doing discovery on that. As far

22

1   as that goes, he never -- by the way, Judge, he never complained
2   about that ever. That was something that we first had notice of
3   during this case when we were doing the responses to discovery.
4           THE COURT: But he --
5           MR. HORWITZ: That's a false statement.
6           THE COURT: Wait for me. Wait for me. But he has
7   always said to me that this particular officer engaged in racial
8   profiling, hasn't he?
9           MR. SOTOS: No, Judge. The first time -- the first
10  time that he ever mentioned Bruketta was on July 22nd, 2008,
11  which was after all of the alleged retaliation that he's
12  complaining about with the --
13          THE COURT: You're talking about Seipler now?
14          MR. SOTOS: Seipler. The first time he mentioned
15  Bruketta was when he was ordered to disclose the names of people
16  who he thought were involved in racial profiling. He submitted
17  a memo on July 22nd, 2008. That was the day after he had been
18  placed on administrative leave as a result of the citizen
19  complaint that he told people to switch seats and gave the
20  ticket to a passenger.
21          THE COURT: Was Bruketta on the memo?
22          MR. SOTOS: He was on the memo, but, again, that was
23  issued the day after the leave. And, by the way, Judge, as far
24  as that goes, they looked into it. They didn't have any reason
25  to think that he was writing down the wrong race. That first

23

1  came up within the last 45 days or so and they're doing an

2  investigation into that broader than just him. But that's the

3  first time that came up. So, that's not even connected to his

4  allegations in this case. But it certainly doesn't have

5  anything to do with this criminal conspiracy nonsense

6  involving --

7         THE COURT: Okay. I got it.

8         But, counsel, look. I'm not going to let you go off on

9  a year's worth of discovery on Sheriff Nygren and whether or not

10 he hired somebody to kill somebody in some location because that

11 might show that he was trying to cover things up to fire your

12 client. All right?

13        MR. HORWITZ: All right.

14        THE COURT: Now, I want to get the case done. Your

15 client's position is he made a legitimate complaint. He made it

16 through legitimate authorities. What he said was true, and

17 because of that in retaliation he got fired.

18        MR. HORWITZ: That is the core section 1983 First

19 Amendment retaliation. That is the core concept of the case,

20 yes, your Honor.

21        THE COURT: That's it. It's straightforward. It's

22 right there.

23        MR. HORWITZ: Well, that's correct. That is a core

24 aspect of the case.

25        THE COURT: Well, what else is there?

24

1         MR. HORWITZ: There's a Monell theory.

2         THE COURT: Okay.

3         MR. HORWITZ: There's code of silence. There's

4  retaliation. For example, there are seven officers, Judge, who

5  have come forward to testify, five in deposition, that there's a

6  code of silence at the department. There's retaliation for

7  coming forward. If you exercise your First Amendment -- if you

8  speak out against the department -- five cops have testified.

9  These are guys that are working at the department, except for

10 one.

11        THE COURT: Okay.

12        MR. HORWITZ: I can give you their names if you want,

13 but you got from 18 years on the department to less than a year.

14 We have two officers who have not yet testified who I've

15 disclosed to defense counsel are coming forward, as well, to say

16 exactly the same things, one who is actually willing to be a

17 26(a)(2)(b) witness as to racial profiling, how these tickets

18 are generated, the training the officers receive, and whatnot.

19 His name is Timothy Madison.

20        THE COURT: Is that the 26(a)(2) witness you talk about

21 sometimes?

22        MR. HORWITZ: Yes. The need for him recently came

23 forward based upon the 140 tickets.

24        THE COURT: What's your 26(a)(2) witness going to say?

25        MR. HORWITZ: He will say -- he will describe how it is

25

1   that racial profiling -- how it is that the officers were
2   trained at the department, how it is that Bruketta was trained
3   at the department.
4           THE COURT: Yeah.
5           MR. HORWITZ: How it is that tickets are generated.
6           THE COURT: Okay.
7           MR. HORWITZ: And how it is officers establish --
8           THE COURT: How is that opinion testimony so far?
9           MR. HORWITZ: Judge, if it isn't 26(a)(2)(b) testimony,
10  you ought to rule on that.
11          THE COURT: No. I'm just asking how it was. All
12  you've done is tell me I saw this, I saw this, I saw this. How
13  is that 26(a)(2)?
14          MR. HORWITZ: The reason why I believe it's 26(a)(2)
15  testimony is because the jury may not understand the training
16  that occurred, how you can take all the training and match it
17  with the correct way to --
18          THE COURT: All right. So, there comes a point in time
19  where he's going to offer opinions.
20          MR. HORWITZ: Yeah. Like you said to counsel, you
21  know, what happens, that sort of thing.
22          THE COURT: Now, counsel, tell me again. What do you
23  want to do besides what we've talked about so I can get this
24  case to trial? What has to be done in your opinion?
25          MR. HORWITZ: All right. Going on, Dr. Meyer is a

26

1   doctor that the defendants indicated they would facilitate in
2   setting up his deposition. His deposition needs to be
3   completed. Dr. Meyer.
4           MR. SOTOS: He testified, as well, but that one wasn't
5   finished, either.
6           THE COURT: Well, it was on May 24th, 2010. He
7   testified for four hours.
8           MR. SOTOS: Right. On May 24th, Judge.
9           THE COURT: How many more hours do you need?
10          MR. HORWITZ: I probably need about an hour and a half.
11          THE COURT: What do you think?
12          MR. SOTOS: Honestly what I think, Judge, is I do not
13  understand why there's never been any need for him to explain
14  why you would take somebody's deposition in May, go through
15  several different discovery closing deadlines that are coming,
16  and then say six months later, "I want to finish his dep." I
17  mean, that's not how -- this case has been conducted in two
18  separate discovery periods.
19          THE COURT: All right. Slow down. Slow down.
20          MR. SOTOS: You're right.
21          THE COURT: All right. Now, number one, you still have
22  the right to do any discovery that you want. Number two, things
23  have popped up in this case. That's why I've tried to talk to
24  you before. Who is Dr. Meyer and in your opinion how does he
25  fit into this case?

27

1     MR. SOTOS:  Dr. Meyer is a doctor who examined

2  plaintiff after he was in a shooting incident.

3        THE COURT:  Psychologist?

4     MR. SOTOS:  He shot somebody, and then he was --

5        THE COURT:  Ph.D. doctor or medical?

6     MR. SOTOS:  Yes.

7        THE COURT:  Ph.D. doctor.

8     MR. SOTOS:  Psychologist.

9        THE COURT:  All right.  So, did he counsel him or just

10 examine him on behalf of the department?

11    MR. SOTOS:  He examined him, I believe, first on behalf

12 of the department and concluded that he shouldn't be on the SWAT

13 team because of the stress, things of that nature.  I think that

14 was primarily what he did.  He said that because of what he was

15 involved in --

16       THE COURT:  All right.  Why wasn't four hours enough

17 with this guy?  Why aren't you done?

18    MR. HORWITZ:  Because the defendants took his

19 deposition for about three and a half hours, and I was

20 entitled -- I was then -- considering the four-hour time period

21 you set and considering the four hours he had available for

22 himself scheduling wise, I was only --

23       THE COURT:  So, you only had 30 minutes with this guy?

24    MR. HORWITZ:  Maybe half an -- maybe 45 minutes, Judge.

25 I don't want to say on the record as an officer of the court

28

1  exactly.

2        THE COURT:  Does that sound right?

3     MR. SOTOS:  I wasn't there.  I don't remember.  I just

4  don't know why it never came up in a half a year.

5     MR. HORWITZ:  Judge, if you want me to respond to that,

6  his associate --

7        THE COURT:  Sure.

8     MR. HORWITZ:  His associate said, "I will give you the

9  dates for Dr. Meyer's deposition."  The reason why --

10       THE COURT:  Is Dr. Meyer under their control?

11    MR. HORWITZ:  The reason why he is under their control

12 is he considers himself somebody that works for the department.

13 He's received --

14       THE COURT:  Still?

15    MR. HORWITZ:  I don't know about still.  I'm telling

16 you the conversation between his associate and me.  First of

17 all, he is a friend of Sheriff --

18       THE COURT:  How much time do you want with Dr. Meyer?

19    MR. HORWITZ:  Hour and a half.

20       THE COURT:  I'll give you an hour.  What else do you

21 need?

22    MR. HORWITZ:  Do I need to say more next time?

23       THE COURT:  No.

24    MR. HORWITZ:  All right.

25       THE COURT:  What else do you need?

29

1       MR. HORWITZ: Okay. So, I've mentioned the deposition
2 of Jose Rivera, Gary Pack.
3       MR. SOTOS: What about Rivera? I didn't know that that
4 was resolved.
5       THE COURT: I haven't done that yet. I haven't done
6 Jose Rivera. You know the ones I've done. You've written it
7 down.
8       MR. SOTOS: No. I just said that because he said that
9 I've already said Rivera.
10       THE COURT: No. You want to take Jose Rivera, and who
11 else do you want?
12       MR. HORWITZ: Just so you know, I did already issue a
13 subpoena for him and Gary Pack for tomorrow, the depositions. I
14 issued that last week.
15       THE COURT: Did you clear the date with counsel?
16       MR. HORWITZ: No, I did not. I just spoke to him about
17 it right now, but, no, I didn't clear the date, Judge. Things
18 were happening very fast with Deputy Milliman's testimony and
19 all the back and forth we've been doing in this case. So, I
20 sent out the subpoena, and I'm more than happy to clear the
21 dates and cooperate fully.
22       THE COURT: Well, and I'll direct that you do so.
23       MR. HORWITZ: Absolutely. That's perfectly fine. We
24 always do it. And, by the way, you wrote down that July 22nd.
25 That's just not correct. But that's their spin on it. That's

30

1 all it is.
2       THE COURT: Well, that's what he told me. That's why I
3 wrote it down, counsel.
4       MR. HORWITZ: I understand.
5       THE COURT: I do that to take notes. I'm not writing
6 an opinion up here. I'm just trying to keep up with the two of
7 you. Now, you want Jose Rivera. Who's the other guy again?
8       MR. HORWITZ: Gary Pack.
9       MR. SOTOS: He's a former State's Attorney from McHenry
10 County.
11       THE COURT: Why do you want Mr. Pack?
12       MR. HORWITZ: Because Deputy Milliman stated that what
13 Jose Rivera would do is speak to those individuals -- speak to
14 the Hispanics, communicate with the Hispanics that were pulled
15 over for driving a vehicle without a valid driver's license
16 and --
17       THE COURT: I'm listening.
18       MR. HORWITZ: And he would then ask them if they want
19 to enter into a deal whereby their case is dismissed or nolle
20 prosequi in exchange for money. He said --
21       THE COURT: Who gets the money?
22       MR. HORWITZ: Jose Rivera does. Somebody in the
23 State's Attorney's Office. I do not know who yet.
24       THE COURT: How does this fit into your guy?
25       MR. HORWITZ: And Sheriff Nygren receives the money.

31

1    MR. SOTOS: Judge, can I just say something?

2    MR. HORWITZ: These are Hispanics that are targeted.

3    THE COURT: I got that, but you still haven't told me.

4    How does this fit into your case?

5    MR. HORWITZ: It fits into the case, number one,

6    Hispanics were targeted. Just like in our racial profiling

7    case, Hispanics were targeted.

8    THE COURT: Who's Jose Rivera?

9    MR. HORWITZ: He's a business partner of Sheriff

10   Nygren.

11   MR. SOTOS: The criminal coc2nspirator.

12   MR. HORWITZ: Pursuant to Deputy Milliman in a sit-down

13   conversation --

14   THE COURT: So, you're telling me that the money, you

15   think, gets to Nygren eventually?

16   MR. HORWITZ: Absolutely, Judge. That is what Deputy

17   Milliman stated.

18   THE COURT: All right.

19   MR. SOTOS: Judge --

20   MR. HORWITZ: He is what he is. He said what he said.

21   And, you know, I don't know what else to tell you, but those are

22   his words.

23   MR. SOTOS: Can I tell you one more thing, Judge?

24   THE COURT: Sure. Why not. I've heard everything.

25   MR. SOTOS: I know. I know.

32

1    MR. HORWITZ: There's still more.

2    MR. SOTOS: This Milliman testified that his perception

3    of this scheme is based on conversations, and I'll provide you

4    with the dep transcript if counsel disagrees, that occurred

5    between him and Nygren and Rivera back in 1999 and 2000, and he

6    believed that this criminal enterprise was ongoing up through

7    2006, which is before --

8    THE COURT: All this happened.

9    MR. SOTOS: -- any of this happened. And all I would

10   say is that these are really serious allegations, and they may

11   well -- you know, if there's a criminal investigation or

12   something of that sort, I get that, but for that to become

13   something that we're now going to investigate in this case seems

14   to me to be so far beyond the pale from --

15   THE COURT: Have you had the number of depositions that

16   were authorized in the case management order at this point?

17   MR. HORWITZ: I don't think so, but I haven't tallied

18   it up.

19   THE COURT: Counsel?

20   MR. SOTOS: I believe that he has, Judge, but I can't

21   tell you that right now --

22   MR. HORWITZ: I don't think that's true.

23   MR. SOTOS: -- for certain.

24   THE COURT: Well --

25   MR. SOTOS: I'm fairly certain that he has.

PDF created with pdfFactory trial version www.pdffactory.com

PDF created with pdfFactory trial version www.pdffactory.com

33

1      THE COURT: Well, if, in fact, counsel hasn't, he

2  doesn't need my permission to take the depositions. If he has,

3  he does. Now, is that it then, those two?

4      MR. HORWITZ: Jill Tutt is a deposition that defense

5  counsel's associate stated that she would set up, and she's not

6  given a date yet for Jill Tutt's deposition. That's a

7  deposition --

8      THE COURT: That was originally set up on July 15th,

9  2010; is that right?

10      MR. HORWITZ: I don't know the date, Judge. What

11  happened is that defense counsel -- you provided four hours, and

12  the deposition goes forward, and then she either has to leave or

13  whatnot, and I don't get an opportunity to redirect, or whatever

14  you want, ask questions.

15      THE COURT: Do you all agree -- did you all agree to --

16      MR. SOTOS: He deposed her for three and a half hours

17  on July 15th, six months ago.

18      MR. HORWITZ: I didn't depose her. Your associate did,

19  noticed her up. And I did not get an opportunity to ask

20  questions, and she left, and that's what happened.

21      THE COURT: How much time do you want?

22      MR. HORWITZ: Two hours.

23      THE COURT: That means you take one.

24      MR. HORWITZ: That's right. I was thinking of saying

25  three.

34

1      THE COURT: I used to be a plaintiff's lawyer, too.

2      MR. HORWITZ: I was thinking of saying three. I wasn't

3  sure how that would play out.

4      THE COURT: I'll give you one.

5      What else you want? When are you going to get all this

6  done by? January 31st? Can you get this all done by

7  January 31st?

8      MR. HORWITZ: Let me just tell you what else, Judge.

9      MR. SOTOS: Judge, I could be done tomorrow.

10      THE COURT: All right. All right.

11      MR. SOTOS: I've been done --

12      MR. HORWITZ: That's fine. Okay. I stipulate to him

13  being done tomorrow, no further discovery.

14      THE COURT: Well, but you can't be done tomorrow,

15  either.

16      MR. HORWITZ: Well, that's different.

17      THE COURT: Can you get all this done by January 31st,

18  counsel on behalf of the plaintiff?

19      MR. HORWITZ: Can I just tell you what else there is

20  before I say it?

21      THE COURT: Aren't you done?

22      MR. HORWITZ: No.

23      THE COURT: What else you got?

24      MR. HORWITZ: All right. The deposition of Ms. Weech,

25  Janet Weech.

35

1        THE COURT: I gave you 30 minutes.

2        MR. HORWITZ: In her deposition she said that there is

3  a complete -- remember I've been sort of ranting and raving

4  about not having a complete database?

5        THE COURT: I've never associated you with ranting or

6  raving.

7        MR. HORWITZ: I lodged some pretty serious allegations

8  attributable to that, sent e-mails to defense counsel, and let's

9  just say I was commenting about it in a zealous way.

10       So, in that regard she said, "Oh, by the way, there is

11  a full database," and no, it is not what defense counsel gave

12  us. So, for example, if you talk about the 140 that you saw

13  relative to Bruketta, Judge, it could be 200. It could be 250.

14  I don't know. But I have notified defense counsel over and over

15  and over again that the information they gave us is not correct.

16       So, what Janet Weech said is yeah, there is a full and

17  complete database for the years you've indicated. What his

18  associate said in the deposition is "Mr. Horwitz, I will get

19  that to you," and she said she would get it to me on Monday, and

20  I understand they had a trial going on, and they've been busy.

21  So, maybe it's in the mail today by Federal Express. I do not

22  know. But she said she would try to do it Tuesday. Memorialize

23  all this by e-mails and whatnot, and what would be really great

24  to have is that information. Now, to be clear, when --

25       THE COURT: Well, they say they sent it to you on the

36

1  8th.

2        MR. HORWITZ: No, it's not been sent to us, Judge.

3        THE COURT: All right.

4        MR. HORWITZ: And to be clear -- so, we want that

5  information. And just so you know, Sieth, who's a defendant in

6  this case, relied upon a portion of this data and not the

7  database that I received from counsel, not that data, but this

8  data that hasn't yet been tendered to me, she relied upon that.

9  Okay? I can explain in great detail, if you want, but she

10  relied upon it in order to determine that there was no racial

11  profiling that took place. So, anyways, I would love to get

12  that data and work with it and then --

13       THE COURT: What other depositions do you have?

14       MR. HORWITZ: The other deposition is completing

15  Sieth's deposition. She produced herself for deposition in my

16  office and then --

17       MR. SOTOS: My office.

18       MR. HORWITZ: No, it was my office. Jim, trust me on

19  it. I remember seeing her in my office.

20       MR. SOTOS: First time. All right.

21       MR. HORWITZ: Yes. And so, I don't care where it

22  follows up, that's fine. I enjoy going to Jim's office.

23  They're very hospitable.

24       Anyways, after I receive the updated database, the

25  actual correct database from the years two thousand -- I think

37

1    it's five to 2008, then I would like to take her deposition and
2    talk to her about the actual correct data this time.
3            THE COURT: All right.
4            MR. HORWITZ: So, her deposition wasn't completed.
5            THE COURT: All right. What about the database?
6            MR. SOTOS: Last time I was here, I wasn't in a
7    position to respond. Now I am. They requested in discovery all
8    data concerning racial profiling statistics -- by the way, over
9    a year and a half ago -- and we gave them what we provided to
10   IDOT, which was the database with all the tickets.
11           What wasn't in there was information about voided
12   tickets because for a variety of reasons, deputies sometimes
13   don't fill out the racial profiling data. When they don't, the
14   department doesn't include that in what they send to IDOT. So,
15   we provided them what they asked for a year and a half ago,
16   which was all the information we provided to IDOT, and he's
17   correct. That's what Kathleen Sieth relied on when she did her
18   racial profiling investigation.
19           Now, he took Jan Weech's deposition, who said -- he
20   asked about what about the voided tickets. She explained the
21   situation and says yes, we do have a database that if we wanted
22   to get information about voided tickets, we can. So, we told
23   him, "We'll get it for you."
24           But, you know, the idea that he can stand here and say
25   like we gave them inaccurate information, false information,

38

1    it's entirely untrue. We provided them a year and a half ago
2    with exactly what they asked for and exactly what we relied on.
3    Now we get towards -- you know, after all these final discovery
4    extensions, now I want to take depositions based on this other
5    thing that I'm looking into now, voided tickets --
6            MR. HORWITZ: Jim, I'm sorry.
7            THE COURT: Now, wait. Wait.
8            MR. HORWITZ: Okay. I'll wait. More than happy to
9    wait.
10           MR. SOTOS: So, we said during Weech's deposition we'll
11   see if we can create a spreadsheet. We don't have a spreadsheet
12   for that because that's not the information that we provided to
13   IDOT, which is what we create the spreadsheet for. See if we
14   can create one and get that to you. And I don't know what the
15   status of that was. Her deposition was just a couple of days
16   ago. With respect to Ms. Sieth --
17           THE COURT: Well, let's back up a minute.
18           MR. SOTOS: Still on the database.
19           THE COURT: On the database, when do you expect to
20   produce the database as far as voided tickets?
21           MR. SOTOS: If we can do that, and I'm sure we can, I
22   would hope within seven days or so, maybe less. As soon as we
23   can get it, we'll give it to him.
24           THE COURT: All right. So, he should have it by the
25   end of the year.

PDF created with pdfFactory trial version www.pdffactory.com

PDF created with pdfFactory trial version www.pdffactory.com

39

1    MR. SOTOS:  Oh, definitely before the end of the year.
2    If we can do it, we'll get it to him before the end of the year.
3        MR. HORWITZ:  I would like it before I take another dep
4    because if it's 250 or whatever relative to Bruketta --
5        THE COURT:  All right.  You're going to have it before
6    the end of the year.  Now, what other depositions do you need?
7        MR. SOTOS:  He said Ms. Sieth.
8        THE COURT:  He says Sieth.
9        MR. SOTOS:  Who he wants to take again.
10       MR. HORWITZ:  No, no, no.
11       MR. SOTOS:  Just so you know, she was at my office last
12   week for her deposition, and she was there all day, but we
13   didn't get to that because he didn't get to the office 'til
14   10:30.
15       THE COURT:  You want Sieth.  You want Cundiff, too?
16       MR. HORWITZ:  Yes.  I guess I don't need to address
17   Cundiff's.  I mean, you're already ordering it.  So, I don't
18   need to.
19       THE COURT:  How long do you want for Sieth?
20       MR. HORWITZ:  Two hours.
21       THE COURT:  Counsel, your input.
22       MR. HORWITZ:  She's a party.
23       THE COURT:  Counsel, your input.
24       MR. SOTOS:  She's already been deposed once.  She was
25   at my office last week all day for her deposition.  The

40

1    depositions -- there were three.  They were supposed to go at
2    9:00, 12:00, and 3:00.  He didn't get there 'til 10:30, didn't
3    get the system set up --
4        THE COURT:  10:45 until he got ready.
5        MR. SOTOS:  Right.
6        THE COURT:  I read it.
7        MR. SOTOS:  So, I think that he's had his opportunity
8    for Ms. Sieth.
9        THE COURT:  You can have an hour.
10       MR. HORWITZ:  Judge, may I on this?
11       THE COURT:  Cundiff.
12       MR. HORWITZ:  That's the only one I want to push,
13   Judge.  I'm sorry.  I'm not retaking her deposition.  Her
14   deposition never completed.  She had to leave when she was at --
15       THE COURT:  You've got an hour.  Do you want Cundiff or
16   not?
17       MR. HORWITZ:  Yes.
18       THE COURT:  How long?
19       MR. HORWITZ:  He's a party.  What you've allowed for
20   parties.  I think it's six hours.
21       MR. SOTOS:  You know, Judge, I understand that you
22   allow six hours for parties.  I keep saying the same thing.
23   We're over two years into the case, and there's no reason he
24   couldn't have taken Cundiff's deposition.
25       THE COURT:  You can have two hours on Cundiff.

PDF created with pdfFactory trial version www.pdffactory.com

PDF created with pdfFactory trial version www.pdffactory.com

41

```
1        All right. What do you want as a fact discovery cutoff
2   date?
3        MR. HORWITZ: I'm sorry.
4        THE COURT: What would you like as a fact --
5        MR. HORWITZ: Could I possibly talk to you about the
6   amount of time?
7        THE COURT: On Cundiff?
8        MR. HORWITZ: On both.
9        THE COURT: No, you can't on Sieth. Yes, you can on
10  Cundiff.
11       MR. HORWITZ: All right. Judge --
12       THE COURT: I was more arbitrary on Cundiff.
13       MR. HORWITZ: Judge, I'm sorry.
14       MR. SOTOS: Judge, I'll agree to three if it will
15  just --
16       THE COURT: Three good on Cundiff? Do you want it?
17       MR. HORWITZ: Judge, he's a captain. He's --
18       THE COURT: Counsel, we're at the end. Why are we
19  taking all these depositions on an '08 case with ten minutes
20  left to go?
21       MR. HORWITZ: The answer is --
22       THE COURT: Yeah.
23       MR. HORWITZ: Well, I'll tell you one meaningful thing
24  that occurred. I actually split with my partner during the
25  middle of this. I just want you to know.
```

42

```
1        THE COURT: All right.
2        MR. HORWITZ: So, that was a very meaningful business
3   activity that occurred.
4        THE COURT: All right.
5        MR. HORWITZ: And, secondly, we have received, just so
6   you know, thousands and thousands and thousands from the
7   defendants --
8        THE COURT: How much time --
9        MR. HORWITZ: -- and we analyze them before we take
10  deps.
11       THE COURT: How much time do you want on Cundiff?
12       MR. HORWITZ: Okay. I would like the amount of time
13  you provided. Just so you know, Judge, these depositions are
14  not easy, meaning that they're recalcitrant witnesses. They
15  don't testify as to what actually takes place. There's a lot of
16  objections. We've done depositions where there's up to three to
17  400 objections lodged by defense counsel and other parties. So,
18  I would like --
19       THE COURT: All right. When are you going to be done,
20  counsel? When are you going to be done with fact discovery?
21       MR. HORWITZ: Do I get to get back to Sieth? I would
22  really like to address the Sieth issue. It's very important,
23  Judge. She was --
24       THE COURT: You already took this one.
25       MR. HORWITZ: Judge, no, no. I didn't already take
```

43

1   her. I was never given the six hours for Sieth.

2        THE COURT: How much time --

3        MR. HORWITZ: I think she came to my office for

4   three hours, Judge.

5        THE COURT: How long of that did you get?

6        MR. HORWITZ: Three hours. She left. "I have to go,"

7   her words were. "I've got to go right now." It was either a

8   personal matter or whatever. She was in my office for

9   three hours.

10       THE COURT: How many hours are you asking on Sieth?

11       MR. HORWITZ: I think whatever your order provided.

12   Just so you -- Judge, just so you understand, I was never given

13   the data that she relied upon. I told defense counsels over and

14   over and over again --

15       THE COURT: So, you're asking for an additional

16   three hours on Sieth. You're asking for six hours on Cundiff.

17       MR. HORWITZ: Just the correct amount of time I'm

18   supposed to have for Sieth. In other words, I never asked for

19   her to leave. She left. So, I would like the full amount of

20   time so that I can get into the basis of her opinions.

21       MR. SOTOS: It was 7:00 o'clock in the evening, Judge.

22       THE COURT: I understand. What is the date you're

23   going to be done with discovery, counsel? When are you going to

24   be done?

25       MR. HORWITZ: Okay. Now we're moving on to the next

44

1   question. I would recommend February 15th.

2       THE COURT: Any objections to that?

3       MR. SOTOS: Yes, we object, Judge. We think

4   discovery -- there's been three final extensions, and discovery

5   should be closed. I don't see any reason why this work can't be

6   done in 30 days, 45 at the outset, but this thing just keeps

7   going on and on, and what's going to happen is --

8       THE COURT: I'd agree, but I got the holiday period in

9   here, counsel. I mean, that's really only 45 days of discovery,

10   if you look at it.

11       MR. SOTOS: You know, Judge, every time we get into a

12   new discovery period --

13       THE COURT: Listen. There's no sense you and I

14   arguing. February 15th is the fact discovery cutoff date.

15   March 15th, 2011, is the dispositive motion due date. You get

16   an hour and a half on Sieth. You get three hours on Cundiff.

17   That's it. Anything else?

18       MR. HORWITZ: Yes.

19       THE COURT: I don't think so.

20       MR. HORWITZ: Well, are you asking a question, or are

21   you withdrawing your question? Because there actually are other

22   things.

23       THE COURT: Like what?

24       MR. HORWITZ: All right. Let me gather my notes.

25       MR. SOTOS: Is that a final deadline, Judge?

45

1        THE COURT: I'm not -- barring health issues, somebody
2  gets sick --
3        MR. SOTOS: I understand that.
4        THE COURT: -- somebody gets sick, somebody becomes
5  ill --
6        MR. SOTOS: I understand.
7        THE COURT: -- I got that. But other than that, I'm
8  not extending it.
9        MR. HORWITZ: Judge, the motion that I filed, I sent it
10  to you with a footnote. The question is is that under seal, the
11  motion that I submitted to you, the motion for extension of
12  time.
13        THE COURT: The motion that you -- the hard copy of a
14  motion that you send to me never makes the court file. You have
15  to CMF file.
16        MR. HORWITZ: I understand. I know that. I sent it to
17  you for purposes of I was coming in right now and you saying --
18        THE COURT: Nothing you send to me ever reaches the
19  court file. So, you don't have to put anything under seal that
20  you send me.
21        MR. HORWITZ: What I meant to say is I have not filed
22  that motion because there's issues in the motion that are
23  sensitive. And so, I ask the question is that --
24        THE COURT: It sounds sensitive to me.
25        MR. HORWITZ: So, the question is whether or not that

46

1  should be publicly disclosed information because people have a
2  right to know, in my humble opinion, or whether or not that
3  should be filed under seal. So, I'm here to ask you that
4  question right now so I don't violate any order.
5        THE COURT: I haven't entered one yet.
6        MR. HORWITZ: Okay.
7        MR. SOTOS: We think the document should be under seal,
8  Judge.
9        THE COURT: Boy, I tend to think the same thing, but
10  I'm not sure the Seventh Circuit does.
11        MR. SOTOS: Well, these are some really --
12        MR. HORWITZ: Do you want to brief that issue?
13        MR. SOTOS: This stuff is coming up in the context of a
14  lawsuit. Discovery is not public. These allegations are so far
15  out there and potentially so damaging that we think it's
16  extraordinary enough that it should be kept under seal and that
17  this shouldn't turn into a big public brouhaha based on one
18  person's --
19        THE COURT: Do you want it under seal, too, or do you
20  want it not under seal?
21        MR. HORWITZ: No. I think the public has a right to
22  know.
23        THE COURT: I understand. You give me seven days to
24  submit cases to me that says it should be under seal. You have
25  the same seven days to submit cases that indicates that it

PDF created with pdfFactory trial version www.pdffactory.com

47

1    shouldn't be under seal.

2        MR. SOTOS:  That's fine, Judge.

3        THE COURT:  They're the same cases we all read in the

4    Seventh Circuit, but I'll want to take a look at them again.

5    You give whatever twist you think is appropriate for under seal,

6    and you give yours.  When do you want to come back here?

7        MR. HORWITZ:  Whenever you like, Judge.

8        THE COURT:  Well, I'm thinking late January.  Do you

9    want a special setting, or do you want me to put you with the

10    general call?  The case behind you at 2:00 o'clock would rather

11    a special setting, I think, right now.

12        MR. SOTOS:  I appreciate that, Judge.  And if that

13    suits the court better, we're happy to do it that way.

14        MR. HORWITZ:  My guess is -- I don't know, Judge.  I

15    really don't know.  My guess is we'll --

16        THE COURT:  My guess is you're about done, and it's not

17    going to be that bad from this point forward.  You don't have

18    much left.

19        MR. HORWITZ:  I tend to agree.

20        THE COURT:  What's the 28th look like?  Is that pretty

21    light?

22        THE CLERK:  January?

23        THE COURT:  Yes.  That still gives me some time to

24    maneuver just in case you got a problem, somebody didn't show up

25    for the deposition.

48

1        THE CLERK:  You already have something at 2:00 o'clock.

2    You have a final pretrial conference.  Right now it's not heavy.

3        THE COURT:  Why don't I give you 2:30 that day.

4        MR. HORWITZ:  What day?

5        THE COURT:  1-28, 2011, 2:30 in the afternoon.  Give me

6    any Rule 37 motions in time that I can try to rule upon them

7    then.

8        Counsels, you have a great holiday.  I'm done for the

9    day.

10        MR. SOTOS:  Thanks for your patience, Judge.

11        THE COURT:  I'm done for the day, counsel.  You had

12    enough time.

13        MR. SOTOS:  Thanks for your patience.

14        MR. HORWITZ:  Okay.  Well, we'll present it by way of

15    motion then, I guess.

16        THE COURT:  I don't know, but you're not getting it

17    today.

18        MR. HORWITZ:  All right.  Thanks, Judge.

19        THE COURT:  Have a great day, counsels.

20        (Which were all the proceedings had in the above-entitled

21        cause on the day and date aforesaid.)

49

1        I certify that the foregoing is a correct transcript from

2  the tape-recording of proceedings in the above-entitled matter.

3

4

5  Mary T. Lindbloom
     Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com